IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

FILED

2004 MAR -4  A 11: 43

U.S. DISTRICT COURT
HARTFORD, CT.

---------------------------------------------------------------x
HARCO LABORATORIES, INC.,

    Plaintiff,

    vs.

GOODRICH CORPORATION and
ROSEMOUNT AEROSPACE, INC.,

    Defendants.
---------------------------------------------------------------x

Case No. 301CV 1277 (AWT)

March 1, 2004

**PLAINTIFF HARCO LABORATORIES INC.'S
SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION
FOR PARTIAL SUMMARY JUDGMENT THAT ROSEMOUNT
DID NOT COMMIT FRAUD ON THE PATENT AND TRADEMARK OFFICE**

Plaintiff, Harco Laboratories, Inc., submits this supplemental memorandum to call the Court's attention to relevant decisions which have occurred since Harco's filing of its original opposition brief in July 2003.

In particular, Plaintiff submits herewith a copy of the decision in *Purdue Pharma L.P. v. Endo Pharmaceuticals Inc.*, 2004 WL 26523 (S.D.N.Y. 2004) (copy attached as Exhibit A). The case involves a finding of misleading conduct on the part of Purdue Pharma in prosecuting its patent application for an extended release tablet version of the "Oxycontin" opioid analgesic.

The present litigation involves Rosemount's registered trade dress in a functional total air temperature sensor, as opposed to a patent on the product. But the issue in the present litigation is Rosemount's assertion of an exclusive "trade dress" right in a range

of TAT sensor designs which meet the Mil Spec. — which is an issue involving the design of a physical product, not simply the trademark which identifies a product. Rosemount has asserted claims of infringement of its registered trade dress against competitors who attempt to manufacture a TAT sensor that looks like the TAT sensor specified in the Mil. Spec. In this factual situation, the standards of candor and good faith applied in patent cases are extremely relevant as they define a developed body of law intended to protect the public from loss of competition in the marketplace.

> An otherwise valid patent may be rendered unenforceable by virtue of inequitable conduct committed during the prosecution of the patent application before the Patent Office. Patent applicants are required to prosecute patent applications "with candor, good faith, and honesty." "A breach of this duty, when coupled with an intent to deceive or mislead the PTO, constitutes inequitable conduct, which, when proven, renders the patent unenforceable." "Inequitable conduct entails a two-step analysis: first, a determination of whether the withheld reference meets the threshold level of materiality and intent to mislead, and second, a weighing of the materiality and intent '[i]n light of all the circumstances' to determine 'whether the applicant's conduct is so culpable that the patent should be held unenforceable.'" "Inequitable conduct includes affirmative misrepresentation of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive." "When balanced against high materiality, the showing of intent can be proportionally less."

*Purdue Pharma L.P. v. Endo Pharmaceuticals Inc.*, 2004 WL 26523 at *20 (citations omitted).

These standards for a finding of fraud on the Patent Office are essentially identical to the standards for evaluating fraud on the Trademark Office.

In the *Purdue Pharma* case, Purdue Pharma represented to the Patent Office in its patent application and in argument that the controlled release oxycodone formulation "acceptably control[s] pain over a substantially narrower, approximately four fold range . . . in approximately 90% of patients." However, Purdue Pharma had not in fact conducted any clinical trials, and had no scientific proof on which to base these

assertions. The statement was only based on the "insight" of the inventor. The Court held that Purdue Pharma was guilty of a material misrepresentation to the Patent Office in failing to disclose the fact that the invention was only a conceptual invention and not based on any supporting data, while at the same time arguing that the claimed invention was a "surprising result." *Id.* at *23. The court further held that Purdue Pharma's acts were intentional, warranting a finding of unenforceabilitry of the patent:

> Accordingly, this Court finds that any good faith belief that Purdue had "discovered" the reduction in dosage range is substantially undercut by its admitted inability to prove, or even to develop, a "set of procedures and methods" to prove this reduction in dosage range (and related ease of titration), and cannot "overcome an inference of intent to mislead." . . . In any event, good faith does not suffice to negate a finding of intent. In *Hoffmann-La Roche v. Promega,* the patentees made a similar argument to the Federal Circuit that "'[b]ecause one cannot intentionally deceive by representing what one honestly believes, the district court's [finding that the intent element of inequitable conduct had been met] judgment cannot stand." In response, the Federal Circuit stated that "[t]he inventors may indeed have believed that they had discovered a novel enzyme, but that belief does not permit them to make misrepresentations in seeking to persuade the examiner to issue a patent for that enzyme." *Id.* Here, even assuming Purdue believed in good faith that it had discovered a novel result--the four-fold dosage range that relieved pain in most patients--that belief did not entitle it to deceptively withhold from the PTO the fact that it did not have any "scientific proof" to support its discovery, or even a method or procedure in place for proving its discovery. Purdue made a deliberate decision to misrepresent to the PTO a "theoretical argument" and an "expectation" as a precisely quantified "result" or "discovery." Accordingly, Endo has proven, by clear and convincing evidence, that Purdue intentionally misrepresented its "discovery" to the PTO.

*Id.* at *26

The facts relied on by Judge Stein in the Southern District of New York in finding inequitable conduct bear strong parallels to the present case. In this case, Rosemount's attorney and Rosemount's declarant Donald Thompson both knew the requirements of the Mil. Spec. at the time of the prosecution of their trademark

application, and made statements about possible alternative design requirements that were false and misleading.

Specifically, Rosemount submitted an Amendment (Cook Exhibit I) and a "Declaration Under 37 C.F.R. §2.41 of Donald I. Thompson" (Cook Exhibit J). In the Amendment, Rosemount asserted that "the present design of the Model 102 Total Temperature Sensor housing configuration is one of many equally feasible, efficient, and competitive alternative designs." [Cook Exhibit I, at G003701]. Rosemount's attorney argued that "design changes may be made in the overall design of the probe housing while still maintaining a design which is an equally feasible, efficient and competitive alternative. Many of the dimensions and shapes embodied in the probe housing can be changed yet the probe housing can still meet the military specification which specifies such probe housings." [Cook Exhibit I, at G003701].

Mr. Thompson's declaration asserted the availability of a number of design changes could be made, and specifically stated that:

> "5. The overall configuration of the Model 102 Total Temperature Sensor which is the subject of this trademark application could be significantly changed, and still be an equally feasible, efficient and competitive alternative design. For example, the corners of the air scoop on the upper end of the probe could be rounded. The inlet configuration of the air scoop could also be changed from that of the present Model 102 Total Temperature Sensor. The back of the air scoop could be a completely different thickness. The strut could also be an entirely different shape. For example, the strut could be made in the shape of an air foil, but having the air foil swept forward, or swept rearward. In addition, the base plate could have an entirely different dimension, or an entirely different geometric shape, such as an oval or square.
>
> "6. All of these changes could be made to entirely change the overall appearance of the 102 Sensor Probe, while still maintaining a probe which is equally feasible, efficient and competitive.

[Cook Exhibit J, at pp. 2-4].

However, Mr. Thompson had no actual data to support these statements. There was no test data covering a Mil Spec Probe regarding the "rounded corners" assertion. [Cook Exhibit T, at p. 90, lines 13-20, p. 91 lines 1-13 and at p. 92 lines 23-25]. There was no test data that a sensor with a different appearance would meet the Mil. Spec. [Cook Exhibit T, at p. 92, lines 23-25].

Ms. Thompson represented in paragraph 5 of his Declaration that "the strut could also be an entirely different shape. For example, the strut could be made in the shape of an airfoil, but having the air foil swept forward, or swept rearward." This was recklessly and deceptively false as admitted by him in his deposition:

> "Q. The next part of the declaration states that "The strut which supports the air scoop could be a completely different thickness And with regard to the Mil. Spec. is that accurate?
>
> A. The Mil Spec, I think, as we discussed earlier today, the Mil Spec. would have to be changed to allow that because of the dimensions.
>
> Q. So the final-
>
> A. - defined by the Mil Spec.
>
> Q. Then the Mil Spec. pretty much defines the strut and you can't really change that unless you have a different Mil Spec. is that right?
>
> A. Right. Yeah. Well - or change the existing Mil Spec. which - has happened over the years.
>
> Q. So the next statement in -- in paragraph 5 which says, "The strut could also be an entirely different shape. For example, the strut would be made in the shape of an airfoil, but having the airfoil swept forward or swept rearward" again, with regard to the Mil Spec, is that true that one could make these changes and still comply with the Mil spec?
>
> A. I think, as we talked this morning that the -- the changes -- without changing the Mil spec. The changes that one could make would have to be made within the tolerances of the Mil spec."

[Cook Exhibit T at p.93, lines 1 - 25 and p. 24, lines 1 - 2. (See also p 98 lines 9 - 24)].

- 5 -

Mr. Thompson's representation to the USPTO in paragraph 5 of his declaration that "The inlet configuration of the air scoop could also be changed from that of the present Model 102 total Temperature Sensor. The back of the air scoop could be a completely different thickness" turned out to be an equally deceptive assertion as demonstrated in his deposition:

> "Q. Similarly, the military specification does define -- does specify a maximum thickness of the air scoop, but not a minimum thickness. Thus, the thickness of the air scoop could be varied infinitely within the maximum thickness and still meet the military specification."
> As I recall from our earlier discussion, the -- the thickness of the air scoop is. 0 -- 0.8 inch, is that correct?
>
> A. 0. - yeah, .80 max. Correct.
>
> Q. Realistically, how much thinner could that dimension he made and still meet the military specification?
>
> A. I would say it could be reduced .5. You know, I'm throwing out a number here, but .5 depending on what you did with some of the other dimensions that allow changes.
>
> Q. So, again, the statement, 'The thickness of the air scoop could be varied infinitely", is a bit of an overstatement where you're talking about a difference between .5 and .8, isn't it?
>
> A. Again, its tenths of inches, yeah."

[Cook Exhibit T p.101, lines 1 -22]

Mr. Thompson's argument to the USPTO in paragraph 7 of his declaration that "a sensor probe which did not slope downward, and was not tapered would still meet the military specification, but would have a different configuration than the present sensor probe" is yet another example of Rosemount's disingenuousness. In his declaration, Mr. Thompson is specifying to the USPTO what design changes would be available to a competitor even if the applications were granted as a registration. Mr.

- 6 -

Thompson confirmed his intention during his deposition:

> Q. Well, do you think it's reasonable for competitors to look in the trademark file and to rely on statements you put in the record there?
>
> A. Yes.

[Cook Exh, T p.119 lines 24-25; p 120 lines I and 4] and.

> Q. And do you think it's reasonable for someone like HARCO to look at the statement in paragraph 7 of your declaration and say, A sensor probe that did not slope downward and was not tapered would still meet the military specification but would have a different configuration than the present sensor probe?
> Is it reasonable for a competitor to rely on that statement in deciding how to design a product?
>
> A. I - I can't answer that.
>
> Q. I call your attention to the last paragraph, paragraph 21 of that declaration, which says that the statements -- referring to the statements in the declaration -- were 'made with the knowledge that willful false statements and the like.. ,are punishable by fine or imprisonment or both under Section 1001 of Title 18 of the United States Code and that willful false statements may jeopardize the validity of the application or any registration resulting therefrom."
> And so you signed this declaration under penalty of law, and in it, you say that a design which "did not slope downward and was not tapered would still meet the military specification but would have a different configuration than the present sensor probe."
> So that was true when you signed that, isn't that true?
>
> A. That was true when I signed it?
>
> Q. Uh-huh.
>
> A. I - I was stating it as being true.
>
> Q. So that -- you know, that -- and that's still true today, isn't it?
>
> A. Truth doesn't change. Yes.
>
> Q. Okay. So the HARCO probe that we looked at, which is Exhibit 8, falls within the scope of this paragraph 7, this last part of paragraph 7 that we just discussed?

A.   Yes.

[Id. at p.120, lines 6-25 and p.121, lines 1-20]

Harco followed the roadmap provided by the Thompson declaration and still it is forced to defend Rosemount's infringement claims and the specious argument that those changes were not sufficiently significant! [See Cook Exhibit T p.94, lines 14-25; p. 95 lines 1-25; p. 96 lines 1-24].

Clearly, the USPTO Examiner was never told by Rosemount that the infinite variety of alternative designs laid out in Mr. Thompson's declarations were totally lacking in engineering back-up through testing, etc. or that a competitor such as HARCO, relying on the declaration's road-map would build a TAT Mil Spec Probe which has neither a downward slope nor taper, could nevertheless be charged with trademark infringement because of Rosemount's claim that those changes simply were not significant enough!

The USPTO Examiner had the right to expect candor, honesty and full disclosure in connection with Rosemount's re-application. Simply put, candor, honesty and full disclosure were not part of Rosemount's deck of cards in its dealing with the US Patent and Trademark Office.

The fact pattern here is identical to that presented in the *Purdue Pharma* case. Rosemount made broad representations to the USPTO as if they were fact. But these representations were not supported by actual data, testing and trials. Mr. Thompson's statements were based on his "judgment," and on his "feeling" and on "promise" [Cook Exhibit T, at p. 90, line 20, p. 106, line 3, and p. 139 lines 4-6], not on data. Mr. Thompson signed the declaration that his attorney had drafted based upon input from

Mr. Thompson and Mr. Thompson's engineers [Cook Exhibit T, at p. 88, line 19-p. 89, line 7, p. 128 lines 7-25 and p. 129 lines 1-20]; but he had **no evidence** supporting the broad statements in his declaration. Rosemount acted fraudulently in asserting the availability of design alternatives that would meet the Mil. Spec. when in fact Rosemount had no data that would support the assertion. At the time of Defendants' trademark application, there had never been a TAT probe other the Model 102 that met the Mil. Spec. Mr. Thompson did not know of <u>any</u> TAT sensor which met the Mil. Spec. other than the Rosemount Model 102 probe. [Cook Exhibit T, at 36]. [1]

Rosemount's misrepresentations and lack of candor are repeated time and again in their filings with the Trademark Office. After the second Office Action, again rejecting the application on the grounds of functionality, Rosemount represented that "The design is not one which competitors need to use to produce an economically feasible alternative design." Rosemount submitted photographs of temperature sensors and represented that "the sensors of Exhibits A through K show devices that either directly compete with the Model 102 sensor, or may be slightly modified to compete with the Model 102 sensor." [Cook Exhibit O, at G003852; Cook Exhibit P, at G003859-3862]. However, none of the submitted photos showed a probe which met the stringent requirements of the Mil. Spec. , as admitted by Mr.Thompson a in his deposition:

> Q: Now, in the June of '94 declaration, do you recall that when it had those Products A through L pictured?
>
> A: Yes.

---

[1] As prior noted by Harco, Rosemount is also culpable of literally false statements, by representing that "the military specification does not define the shape of the strut" [Cook Exhibit J, at p. 3, ¶8] when in fact the specification expressly and specifically limits the shape of the strut [Cook Exhibit T, at 41; 98],

> Q: If I understood you right, you said that those probes shown in Exhibits A through L did not meet the military specification, right?
>
> A: As they stood, correct.
>
> Q: Okay. But the 102 Probe that you filed the registration for, that did meet the Military Spec 27223 (sic), right?
>
> A: Yes. Yes.

[Cook Exhibit T at 137-139; see 111-113]. None of the probes shown in the submitted photos were Mil. Spec. compliant. And Mr. Thompson had no data to support the assertion that the probes could be modified to meet the Mil. Spec. *Id.* These statements were words, nothing more. But these words led the Trademark Office to grant registration for a functional product. As in the *Purdue Pharma* case, "the record as a whole reflects a clear pattern of intentional misrepresentation of a material fact. " *Purdue Pharma*, at *27.

In conclusion, Rosemount has been responsible for false, unsupported, deceptive and misleading representations (in the Amendments and Declarations) regarding material assertions (the availability of alternative designs meeting the Mil. Spec.; as well as the contention that a non-infringing design could be developed by changing the taper and slope of the probe); Rosemount and/or Mr. Thompson knew or should have known of the falsity of their statements; Rosemount intended that the PTO rely on its representations and grant Rosemount a trademark registration on its TAT sensor; and the Examining Attorney reasonably relied on the representations and granted the registration. Clearly, he had been misled and for that reason alone, Rosemount's misconduct cannot be rewarded. The USPTO had the right to expect

candor, honesty and full disclosure by Rosemount. Rosemount failed utterly to meet this standard.

Furthermore, the public interest in free competition in the market for spare parts for military aircraft has been damaged by Rosemount's baseless claim of trademark rights in TAT sensors that are purely functional devices. Rosemount is guilty of fraud on the Trademark Office and its motion for summary judgment should be denied.

Respectfully submitted,

2/27/04
Date

*[signature]*

Wesley W. Whitmyer, Jr.   (ct03509)
Stephen P. McNamara (ct01220)
Arlana S. Cohen (ct21707)
St. Onge Steward Johnston & Reens LLC
986 Bedford Street
Stamford, Connecticut 06905-5619
Telephone: (203) 324-6155
Facsimile: (203) 327-1096

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing:

**PLAINTIFF HARCO LABORATORIES INC.'S
SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION
FOR PARTIAL SUMMARY JUDGMENT THAT ROSEMOUNT
DID NOT COMMIT FRAUD ON THE PATENT AND TRADEMARK OFFICE**

is being served on all counsel of record, on this date, by first class mail, postage prepaid, by depositing the same with the United States Postal Service in envelopes addressed to:

Daniel W. McDonald
MERCHANT & GOULD PC
3200 IDS Center
80 South Eighth Street
Minneapolis, Minnesota  55402-2215

Elizabeth A. Alquist
Day, Berry & Howard LLP
CityPlace I
Hartford, CT  06103-3499

February 27, 2004
Date

_____
Stephen P. McNamara